06-1062 MBO Laboratories v. Becton Dickinson May it please the Court, this is the appeal that involves a reissue patent during the safety review. The issue is largely claim construction. The District Court, after expressly ruling that the claims in the patent were not limited to the blood collection method of the preferred embodiment, interpreted all the claimed elements at issue as if they were. In some doing, the interpretation was so extreme that in some of the cases the elements no longer cover any embodiment ever disclosed in this whole series of patents. In others, they omit coverage of preferred embodiments of the invention in these specifications. The principle issue that I want to address... Isn't the real question in the reissue setting what scope was surrendered during prosecution of the patent? If you actually surrendered a preferred embodiment, you surrendered a preferred embodiment. Game's over, right? That's correct. So what was it? I made a chart, sort of interesting. This patent went through a long history, right? It did, right. And specifically, what scope did you surrender at each point along the way? I think, to put it in context, let me go to the question of what the judge actually said you surrendered in the reissue context, and then come back to what we did see. On retraction, he said you surrendered everything other than drawing the needle back into the case, right? That's what he said. That's what he said. That's what he said. And your adversary maintains that there are certain references over which you overcame a rejection wherein you made such a surrender. That's the position, but it's not correct. Isn't it your job to address those particular references? Yes, it is, Your Honor, and we did set it up briefly, and I'll do so here. What we did here in connection with this, the application, the reissue application was, first, to change the retraction word in the claims to relative movement. In other words, the guard can move relatively with respect to the needle tip. In other words, the retraction movement to protect the needle tip involves pulling the needle back into the guard, which is part of the preferential argument. Or, by using the reissue terminology, relative movement, either way, the guard can be moved over the needle tip to protect the needle tip, or it can be retracted into the needle tip. This was expressly explained in the reissue application, defining the terms relative movement. This is an issue which is floating throughout the brief, but I'm still having trouble with pinning it down, so help me if you would. The term retraction, is it your position that the needle has been retracted any time it finds itself within the guard? No, it isn't. For example, take the Bayless patent. Is the Bayless patent, is that an instance of the needle being retracted into the guard? It is not. The guard in that case is... Because that's relative to what? You could say, well, vis-a-vis the guard, the needle is being retracted vis-a-vis... What's the reference? How do we know this? Basically, what we know in Bayless and how the prosecution treated it, the examiner treated it, how we treated it, was that Bayless is one where you're holding the needle and releasing it, releasing the guard, and it's spring biased, so it springs forward and goes over the needle tip. That is not a retraction reference. A retraction reference would be where the needle is pulled back into the guard. And there are retraction references in this patent. But if Bayless was an example of the guard springing forward, the needle being stationary, at A655 you distinguish Bayless in order to traverse the rejection by saying, with respect to your invention, thus with the needle retracted into the body. That's correct. Well, now, aren't you then saying that with respect to Bayless, it's a matter of the needle being covered by something that's sprung forward to cover it up, whereas you're saying my invention is different from Bayless in that we withdraw the needle back into the case. No, that's not what was being said there. Yes, it is. The language, the express language is thus with the needle retracted into the body and blocked at the front face by the mousetrap, by the latch, right? From emergence, any human contact contaminant is positively avoided. It's the re-emergence issue that's the key issue. That's what we gave up here. What happens, regardless of how that guard gets over the needle tip here, in our invention, is that spring clip snaps that blocking flange closed, and the needle can never re-emerge again from the guard, the needle tip. That's what we used to distinguish all this art. But Bayless, that's true in Bayless too, isn't it? No, that's not true in Bayless, and that's why we say the flaps can be opened in Bayless. Can they be opened by prying them apart? Well, you can pry your latch off too if you've got a screwdriver. Well, it's obviously... Why do you pry them apart with Bayless, your fingernails? Well, you could do it any way, in fact. In fact, if you pulled it back, it would come out. What we distinguish... But doesn't that hurt your case, if your device is also capable of being opened up? Well, it can't open up within a reasonable sphere. What we were distinguishing in the original application in prosecution throughout is that there is art here that retracted. The first pieces of art we were ever confronted with in this case clearly retracted the needle into the guard. In our specifications, we say that's prior art. In fact, there's art both ways. The movement of the guard both ways is prior art. What we were distinguishing, and what you never see in these comments, is a comment that our invention is retraction. It could not be. We might have distinguished Bayless by that, but we wouldn't have distinguished Coffey and DuPont, also of record at that time. Also, we wouldn't have had the statements in the specifications themselves saying the prior art retracts. This is what we distinguish, and every time that argument is made here, what we're always talking about is the blocking flange activating so that the needle tip doesn't come out. That's what we made a point of. Each time that comes up, throughout the prosecution, from the very beginning, from the very first reference, in the very first application, which was Coffey, we make that argument. Well, there's no question if you trail through the file history that the reemergence issue was totally surrendered. It's just gone. You distinguish against every one of the rejections almost. You say, well, we're different because we're going to be able to, when our mousetrap goes shut, the mouse can't get out. That's correct, and that reemergence point is still in the added reissue claims. That wasn't taken out. What was changed? In the reissue claims, your claim 32 is broader than any of your other claims because you simply are blocking emergence as opposed to blocking immediately and positively. Your claim 32 is broader in read. And as the Court held at A23 of his opinion, A24, they said there's no question here, right? Your reissue claims are broader than the original patent, both on the retraction issue and on the immediate recapture issue. On the retraction issue, that's surely the case. So, but I mean, let's assume you prevail on the retraction issue. You're going to have to also prevail on the immediate recapture, on the reemergence issue. Well, the immediate reemergence issue, there's a difference between what the Court construed as to immediately and an immediate reemergence issue. Well, I know you've got a disagreement about immediate. But, I mean, if we accept something closer, either the district court's claim interpretation or something closer to it than yours, then you're going to suffer on that limitation, aren't you? No, I don't think so because immediate reemergence simply means this. Again, it's referring to the action of the blocking flange. Well, that's your take, as you said in your brief. And the question is, if we disagree with that, then you've got a surrender issue on Claim 32, right? 32 and 33. Well, first of all, the word immediate doesn't appear, as you know, in Claim 32. Well, of course not, because you've broadened it in reissue. I mean, come on. Well, we did. We did broaden it. But the word immediate that he was talking about when extruded through the claims is something that appears in terms of Claim 1, which is not an issue. It explains immediate in terms of the blocking flange operation. And the method claims have immediate in their preamble, which he construed as being simultaneously with removal of the needle from the live blood dump. And simultaneous in the specification deals with the preferred method of using live blood donor operation. But it does not deal with the issue of the immediate effect or what happens to the blocking flange as soon as the needle is out of the way. So in terms of the needle. Well, isn't that the real issue, the immediate coverage of the flange comes out? Yes, I think it is. It's immediate at that point. As soon as the needle is out of the way, whether you push the guard over the tip of the needle or you pull the needle tip into the guard, that flange snaps shut. And that's the action. That's an immediate action. Every place. If you don't, in the invention, the user doesn't have to take an independent step to snap a switch of some sort in order to have the needle then immediately in, right? That's correct. And so in your invention, what's happening, the genius is that as you remove the needle from wherever it's been, just as a mechanical way of the whole thing working, bingo, the mousetrap slams shut. That's correct. And that occurs. Because with the accused device, I gather, the doctor could walk around the examination room with the needle still sticking out and blood dripping off of it as long as he wanted to. Because there's no encasement encapsulation until he pops the trigger, correct? Correct. I think that could happen in either case, including ours. How? If you take the needle out of my arm, your patented invention, you take the needle out of my arm, you're not going to walk around the room, doesn't it, when you take it out, doesn't the thing snap shut? You have to back the needle out of the syringe. Back the needle out. You have to back it out. And in the preferred embodiment, if we're dealing with a live blood donor, it is pressed against your arm, the wings are pressed against your arm, and you do pull it back. So that is needed. That's what we call, however, simultaneously with removing the needle from the patient's arm. That's different than the immediate action of the blocking flange. That's simultaneous. That deals with a method step dealing with the preferred embodiment, which is for a live donor. However, the patent also says this can be used with tubing and other things, wherein you don't get to press the angel wings against something. There's nothing you have to press to. In that case, you could pull out the needle and carry it around. That's not a very safe thing. But that's not what this claim covers. This claim provides a safety needle for you to automatically activate it, which is exactly what the accused product does, too. I mean, you could carry around their product, but that's not the way they want you to use it, either. They want you to activate it as soon as it's removed from the patient or whatever, and do it right away. That's an operator problem, not the problem of the structure that we're claiming here. I mean, it's immediate. It's talking about the flange snapping shut. I'm in my rebuttal. Would you say that immediate is also automatic? I would say yes, in connection with moving the needle out of the way, in the direction of automatic, yes. It becomes an automatic step. Yes, it becomes an automatic step. You do not have to separate them. To characterize it a little bit differently from Bayless, which has a clip on it, you need to push to activate it. You don't have to do that. You just have to click that. So that's different. I do want to say something. I think this is a sufficiently complex case, and we've questioned you extensively, so I think if you have other points, it may be useful to continue the argument beyond the prescribed time. Exactly. I appreciate that. Feel free to continue, and at some point we'll have to cut you off, but not yet. Let me just go back. We will give the other side equal time. Let me just go back to sum up on that relative movement issue here. For most recapture cases, three things occur. Number one, the patent itself says something is the invention or the key part of it. Number two, that winds up in the claims, and it's the reason the claims get locked. And in the reissue claim, part three is that key limitation gets removed. That can't have happened here and did not. We acknowledge that retraction is prior art. The prior art we were continually cited against. Not Bayless, but other art. Right, but there's nothing to preclude an applicant from surrendering a piece of prior art. That's true. So, I mean, I hear you talking about what an ordinary garden variety fact circumstance looks like, and that's clearly not what we have here. So that doesn't advance our argument any. Well, in here, if you have to look at what the arguments are in prosecution, you see each time the argument is made, it's claim-specific. It's not the invention is this. What it is is claims one, claim 28, claim 29. They don't have these things. And Bayless initially was distinguished for five different reasons. Can I ask a question because time is running? There are six terms that were interpreted by the court that have been in disputes, immediately, sightably receiving, adjacent. Now, some of them are relatively moved and sightably receiving or sort of in the same family. But do you have to, if you lose on any of those claim construction issues, is the game over? I mean, don't you have to prevail on all of them? No, I do not. I have to prevail on relative new movement, relative new movement. Because based on the court's constituents. Well, what about immediate proximity and proximity? No, because that doesn't appear in claim 32 unless you read in immediately into that claim. The immediately, there's a difference. Assume we do. There's a difference between, well, that's a problem. Immediate proximity and immediate are not the same claim limitations. Immediate proximity refers to the positioning of the needle tip with respect to the guard. That's how that is used in claims. Immediate, as the court was interpreting, that point deals with the time between when the needle is pulled out of the patient and captured. So what he read into the claim was the latter, not the former. Mounted on said body, is that a problem? Mounted on said body? Yes, to the extent that it requires, the court ruled that that required the flange. Not the spring. The flange by itself to be external here, whereas the whole claim limitation. Well, is the flange in the accused device internal? Is that a sufficient ground by itself? The internal versus external arc in front of the guard versus behind the face of the guard. Is that a sufficient ground if you lose on that for you to lose? No, that would be, there still would be a doctrine of equivalence argument on that. Where the relative movement is a problem for us is that by limiting it to retraction for the reasons said, it's a recapture situation. Not only do we have literal infringement of any of the claims, because they move it forward, but there wouldn't be a doctrine of equivalence argument on that. So the relative movement was, I must hold on. Now, the immediately, is it your position that immediately, I think so, but I just want to make sure, refers to, let me just do this by giving an example. I'm the physician, I pull the needle out, I hold the needle up while I'm talking to the patient, and then I say, oh, I haven't shielded, and I pull the needle back and it goes snap. As soon as I pull it back, it passes the front of the guard, snap, it covers. In your sense, that's immediate, correct, as that term is used in this patent? As that term is used in the patent and in the claims. All right, but the language, I mean looking for example at the summary of the invention language, thereby upon withdrawal of the needle from the blood donor, the needle is immediately retracted within the guard, seems to suggest immediacy in a different sense from my hypothetical position. Yes, because for the same reason that it's not a good idea to do this. But you don't think that limits the use of immediate? But that's not limited by itself, the use of immediate in that context is not limited by itself. Because we do have method claims in all the earlier patents directed to that specific method of using it in the blood donor. That's in the 347 patent. These claims here are directed to the structure itself and the method that's described as really providing the parts. It's not a method of use. So in terms of the use of immediate in that context, yes there are claims in the series that cover it exactly that way. Although I don't think it uses the word immediate. But there are claims that cover that particular method exactly as in the summary of the invention. But it's not these claims. These claims deal with the structure of the device itself, not how the operator uses it. Go ahead, I'm sorry. With respect to immediate, aren't we really talking about two separate items when you retract the needle from the patient? Is it an immediate retraction within the body and then the flange snaps on? It's a two-step process because you're talking about an immediate retraction and also an immediate snap of the flange over the end of the sleeve. That's correct. The summary of the invention, I believe, refers to the former, which talks about the use in a patient, that use as being simultaneous with the removal from the patient. So the needle is immediately retracted. It's immediately retracted. And it's simultaneously with the retraction of the needle from the patient, it's protected. And it's protected because the flange snaps shut immediately as soon as the needle gets out of the body. But you get two immediate steps. We call it a simultaneous step. The summary actually uses the word immediate as opposed to simultaneous. I believe it uses the word simultaneous. Does it? Well, I was, maybe I'm correct. Thereupon withdrawal of the needle from the blood donor, the needle is immediately retracted within the garment. This is on, I'm sorry, A73 column 3, line 3. It's looking at column 2, the summary of the invention, starting with line 56. To this end, it has provided a new and improved system, which one, shields the blood-contaminated needle simultaneously with its withdrawal from the donor. Right. But on the next page. But it goes on to say that risk of the possible exposure is virtually nil. Right. If you do it simultaneously, that's correct. If you do it simultaneously by that method, that's correct. Right. But if you take the needle out of the patient and you don't have then the step of pulling the needle back in, then you're, so you're saying that this summary of the invention is limited to one embodiment. It's limited to the preferred embodiment of the blood collection method, but it isn't the preferred embodiment. That's an unusual description. The preferred embodiments are later on in the pattern at the bottom of column 3. But what this actually describes here is two different things. Number one, the method. And number two, the structure. And it talks about the operation of the needle. What they claimed in the first CIP application, 347 was, the method. But it says a new and improved system. The system is the product, not the method. The system is, some of the claims here are directed to the system. Well, claims 1, 12, 13, 14, all of that are system. 32 is a system. So that's really a product claim. It's not a method claim. That's correct, Your Honor. However, in terms of. And so this summary of invention has to read on 32, has to read on 1, 12, 13, 14, 17, 18, right? I don't think so. But it says system, a new and improved system. No, I don't think. A safety needle system. In terms of how this summary is written, it's talking about dealing with it in terms of the blood collection method of the preferred body. It then talks about, in the specification, about how other uses, which would not involve that, are possible. And basically, what we're saying here is, we're reading the summary of an invention here to narrow it in terms of what we were claiming. We started out claiming a blood collection system. That's in the 347 patent. In this patent, it's claimed more broadly. And, in fact, the art cited against us is not a blood collection art. Bayless is not a syringe. It's not a blood collection art. It's a piece of art. Very well. I think you have nothing. No, there is. No, thank you. I appreciate you asking. Certainly. I'm going to add the equivalent time. If you would. Good morning there. Please, the Court. Your Honor, this is a case in which the district court made the proper interpretation of the claim in light of the stated purpose of the invention, the specification, particularly the summary of the invention, which must be commensurate with the scope of the claims, and the repeated statements in prosecution history. The ADD-5 specification clearly stated that it was directed to a system that shielded the contaminated needle simultaneously with its withdrawal from the donor, and that the needle was immediately retracted into the guard or the body. And the way that they distinguished this invention against the prior art was the prior art allowed the open manipulation of the contaminated needle, thus leading to the possibility of accidental needle sticks. Their invention was directed to a system or a method that would make sure that that would not happen. And as Your Honor quoted, that would be virtually nil or virtually eliminated. So is the accused device if the doctor pushes the switch? Pushes the switch to move it forward. Sure. Problem is, Your Honor. Well, you were just talking about old end results. The end result's the same. Well, no, it's not here, Your Honor, because if you retract the needle into the guard, then there is no open manipulation. If you have to... What do you mean by open manipulation? The needle is still sticking out. You have the needle in your arm. Is the needle still sticking out after the accused device, the switch has been popped, and the thing leaped forward? No. Well, yes, it is, Your Honor, because you have to first get the needle out of the skin, and you're not going to be able to stick the plastic guard body into someone's skin. If you retract the needle, as soon as the needle leaves the skin, it then goes into the body and is protected. You're talking about under the patent. Under the patent. That's why they limited it to, in all the prosecution history, they combined the retraction plus the device to prevent reemergence. They always coupled the two together. Let me ask you, on retraction, I still find this the most befuddling aspect of the case, perhaps because I'm not thinking about it the right way. If you would, if you could take the figures in the patent, in particular figures 3, 4, and 6B, those are figures of the patented device in various states of its process from being exposed needle to being a captured needle. Why is it that figure 6B, for example, is deemed to be, why is it correct to say that this is an instance in which the needle has been retracted, at least vis-a-vis the block 44? It looks to me as if it was equally plausible to say that the, what's the number, 82, the guard 82 has been, vis-a-vis 44, has been pushed forward to cover the end of the needle. So if both of those constitute a form of retraction, then isn't retraction the same as relative movement? Your Honor, they actually, relative movement and retraction could be and should be interpreted to be the same way, the same thing. In fact, that's how they described it in one of the earlier patents in the prosecution history. Then why would relative movement be only one-way movement as opposed to two-way movement? Because you are still moving, you are holding the guard steady and you are retracting the needle. So they're moving relatively to one another in that direction. I mean, there was a claim… Holding the guard steady vis-a-vis what, the patient? Vis-a-vis you're holding the guard steady, the needle is in the patient, you are holding the guard steady… Against the patient's arm. Yes. But if you're not… What is… Setting aside for a moment the particular use with the patient, instead let's just say you have the needle right here in front of us. Why is it correct to say in that context that as the guard moves over the needle or the needle moves into the guard, that it is, why is it correct to say that that constitutes retracting the needle rather than extending the guard? It seems to me it's the same thing. But it's… Vis-a-vis the rest of the syringe. Right, but it's not, Your Honor, because you can't divorce it from the way it is used and from the purpose of the invention, which was to prevent the open manipulation of the contaminated needle. And if you do look at… But the point is that… But either way though, you still would not be able to manipulate the needle, would it? Whether it's retracted in the guard or extended, or the guard is extended, it still would not, would prevent manipulation. No, Your Honor, because in order to, in order to extend the needle, in order to extend the guard over the needle, you would have to have space in which to do that. If you have the needle in the patient, you can't push the guard into the patient's skin. You have to hold the guard next to or close to the patient's skin and retract the needle out. That's the only way to prevent an open needle from existing. Plus, where you're retracting the needle, the flange automatically shuts as soon as the needle passes behind the flange that's on a spring clip. The question here is surrender, right? Correct, Your Honor. So what, in your judgment, is the strongest reference in the file history wherein the applicant surrendered, if you will, forward motion as opposed to retracting back into the shell? Was it Bayless? There's… What's the strongest? There's several, Your Honor. Well, pick the one that is that where, clearly and unambiguously, one of skill in the art would reach the conclusion that there was a surrender with respect to retraction, meaning that retraction could only be pulling the needle back into the case. In all of them, in all of the references that distinguish, they do talk about retraction, all of them. There are none in which they argue that expand, that moving the guard over the needle… They can talk about retraction, but in order to surrender, they have to be saying, we are different from the reference that's been cited. We're going to traverse the rejection because we're different from Smith in the following respect. Now, can you cite me a reference in which the applicant said to the examiner, you've cited a reference against us. We are different because when we say retract, we mean pulling back in. Correct. And if you look at the first patent application, which ultimately matured into the 655… You're talking about the rejection over Cothy? That's the original application. That's the Coth and Dupont, Your Honor. Yes. And where in the record in arguing over Cothy did they give up in terms of retraction coming forward as opposed to going backward? I think it is on page A, 1278 and 1280. In their reply to me here, Your Honor, they said that they did not abandon moving the guard over the needle because relative movement was contained in claims 118 and 26 of that initial application. But where can you show me in the record the precise language where the applicant was saying, I'm different from Cothy because my relative motion is retraction as opposed to going forward? There is a – I was actually looking, I think, at the same material on A487 when you cited A1280, but I think it's the same prior article. There is the statement, a chief feature of applicant's invention is not only the safe retraction of the needle or canola 20 into the tubular member 18. That's what you're calling our attention to? That's the passage? That was what you cited in your brief. Yeah, I believe that that's right, Your Honor. It talks about the safe retraction being a key feature of the invention, but there's also an amendment that they made because at least one of the claims that they referenced in the brief, original claim 18, is drawn to relative movement, and there is no retraction limitation in that claim. It's rejected. They then amend the claim to include retraction as an element in the claim. Where in the record do we find that episode? That is also – that is the A1278 and – Is this the same – is this over Cothy again? A1278 that I have. I'm not sure if it's the same page or – I'm looking – no, A1278 is the actual amending of a claim. That's where they canceled claim 18. Correct, and they amended it, but they amended it, and when they amended the claim – Is the amendment means preventing distal emergence? Is that what you're talking about? After retraction thereof in the said guide means? It talks about the – We need to get specific here, sir. Well, the last clause of the amended 18 is means preventing distal emergence of the needle from said guide means after retraction thereof into said guide. That's exactly the language thereof. Now, what is it that tells us that the term retraction in that location or in any other, but certainly for present purposes that location, means something other than simply that the needle finds itself inside the guide means? In MBO's brief to this court, and I believe also to the district court, they specifically agreed with us that the word retraction means rearward movement. You're not moving – if you're putting the guard over the needle, you're not rearwardly moving the needle. You're pushing the guard forward. So when you talk about – when it talks about retraction of the needle, it's moving the needle backwards. It's leaving the guard in one place and pulling from the top. And this is, again, vis-a-vis a patient? I mean, is that your frame of reference here? Because if I'm holding the needle and I'm holding the guard and I go like this, it's vis-a-vis what? Am I moving the guard over the needle? Am I moving the needle back into the guard? It's – all of the references in the prosecution history talks about moving the needle backwards, not moving the guard forwards. Now, you say this – a claim 18 that was being amended, you said had relative motion in it? That is on page – 1278. Or A729, Your Honor. A729? Yes, A729. And claim 18? Yes, claim 18. Guidable means? And if you said being relatively movable between a first position? Right, and a second position. And there is nothing in that original claim that goes to the notion of retraction. But there was, right after this, the example – This claim 18 that's on page A729 got amended and their concept there was relatively movable, right? That's correct. Which could have been going forward or going backwards? Theoretically, Your Honor. And so you're saying when they amended that to say, well, the means for preventing da-da-da is after retraction, that they are then saying we don't go forward and backwards, we only go backwards. That's correct. And that's consistent with the purpose of not having a needle sticking out of the guard at any time once it's outside a person so that you can accidentally stick yourself or stick some others. The whole idea behind their invention is to eliminate – and they use that word strongly – eliminate accidental needle sticks. And if you retract the needle into the guard, that's automatic. If you have to move the needle out of the patient and then move – you have to then physically move the guard forward, again, that doesn't – that's not necessarily automatic. And it does leave open the possibility that you will get somebody who will get injured as a result. And the – above all of this is the fact that in the specification, not the preferred embodiment, but the summary, which has to be commensurate with the scope of the claims by regulation, very clearly say retraction and they very clearly say simultaneous with the withdrawal of the needle from the patient. So they have disclaimed it once. In the specification, they disclaimed it repeatedly in the prosecution history where we only talk about retraction, except in that one claim, which then got amended to include retraction, and that claim got allowed after they then – and in that prosecution, they twice argued we are retraction plus preventing re-emergence. And in addition, it's very curious that the first time that this issue of moving the guard over the needle really comes up is in the context of their reissue application. And the examiner in that reissue, who wasn't the examiner who worked on any of the other patents, one of the reasons that he indicated was the flange blocked the needle upon relative movement of the needle distal portion toward the body, so the distal portion being the one that's furthest away from the doctor, the nurse that's doing the injection or taking the blood or whatever. What the examiner is saying here is, his understanding is you're moving the needle, you're not moving the guard or the body, you're moving the needle toward the body, and that's retraction. He offered the applicants an opportunity to comment on that reasons for allowing the issuance, and NBO did not do that. That's another disclaimer of any flange that the guard should be allowed to move over the needle. When you look at the record as a whole here, and not just focus on one feature at a time, because virtually everything that is in their patent, all of the various elements, are somewhere in the prior art. What the alleged invention is, is really putting them together in such a way that they work cooperatively to meet the objective. Can you tell us in a nutshell why the accused devices don't infringe under the district court's claim construction? I think I understand the relative motion retraction because in the accused device the guard springs forward and covers the needle as opposed to the needle coming back, right? Your Honor, obviously there was a motion for summary judgment that we filed after claim construction in a number of areas, and that motion was unopposed. We have a very strange order from the district court that just says based on the claim construction there's no infringement. They don't tell me there's no infringement because the claims are invalid for having flunked reissue. They don't tell me that. I don't know what the basis for non-infringement is. I'm asking you, what was it? Well, one basis that is very clear regardless of the outcome of the claim construction that we argued below was that our needle doesn't move. Our needle is fixed. Their needle, even if you accept their claim construction, they say that it's slidable and should move both ways. Well, the BD needle is fixed, and I didn't bring an example with me, but... I just had trouble figuring out because the judgment that we're looking at is a judgment of no infringement. That's what's on appeal. Correct. And nobody in the briefs told me why you would have non-infringement in this case. Well, if there is no... the BD needle works such that... We were told in your brief that the accused devices are manufactured pursuant to your client's patent, right? Correct. But I don't know that that means that the accused devices are exactly what's in the patent. You did tell us that in your accused device the doctor has to flick a switch of some sort. Correct. And that that doesn't appear to be the case in the patented device, although we're told that the doctor has to do something in the patented device to activate the mouse trap. That is to say he has to pull the needle back. Correct. So I was saying to myself, what's the difference between activating by pulling the needle back and by flicking a switch? One difference is that the needle is withdrawn from the patient, but by pulling the whole device back. And then once it is out of the patient, then the medical worker hits a little switch and a cap goes over the top of the needle. But you're talking about the BD device and the BD patent, right? Yes. Okay. But I mean, it looks to me as if what has to happen is that it looks as if you have this structure that arises above the syringe, which you would presumably push with your thumb, resulting in the guard running down the length of the canal. Correct? It looks like that's the mechanics of it. Essentially, Your Honor, it's not a full guard. But in the prosecution history here, where a number of the needles were fixed in the prior art, DuPont, Smith, Bayless, they distinguished by saying that their needle was not fixed, that their needle could be retracted by pulling on the other end of the base. But it's not automatic. Is it automatic when the needle comes out of the patient? Under which device? Neither is automatic, right? Because you can pull either one out. Without activating them? In the figure three of the patented suit here, it looks to me as if you can pull that out of the patient and wave it around, right? If you pull the entire device out? Right. Yes. And you've got the needle sticking out. If you haven't taken steps to do something that results in the guard getting over the needle, whether you call that retraction or not is one of the issues. But their method claims go to pulling the needle backwards before the needle is out of the patient. That's the retraction. In BD, you have to pull the entire device out. And the difference is as soon as you do retract on theirs, as soon as you do retract the needle, then automatically the flange, once the needle passes behind it, pops up and immediately it's inside and the flange prevents re-emergence. But it doesn't happen immediately upon removing the needle from Clevenger's body in the patented device. Yes, it does, Your Honor. Because, again, if you just look at the summary... What happens if the doctor chooses to remove the needle from my arm by pulling the whole thing back as opposed to holding it up against me and simply withdrawing the needle? Your Honor, that's not what the patent is directed to. So if it's a method claim you're looking at, or the structure, the way that it is to be operated is you pull the needle out and then the guard covers once you pull the needle behind it. Going back to the summary of the invention, we're still talking about the needles immediately retracted within the guard. Does that to you mean that when you pull the needle out of the patient, the needle is immediately retracted and the guard flange goes up? Yes, and the summary talks about it in terms of simultaneous withdrawal. So as soon as it comes out of the patient and you're retracting the needle with the guard held steady, it is going to be protected. But the protection itself is because of the flange? The protection itself is because of the flange. So the flange immediately covers the end of the guard when the needle passes the end of the guard? Correct. It goes into the guard, the flange pops up, and that prevents the re-emergence of the needle. Now is that immediate term then describing the immediate retraction of the needle or the immediate covering of the guard? Your Honor, it covers the operation of the flange as soon as the needle is withdrawn from the patient. Not the automatic withdrawal of the needle then? If immediate only refers to how fast the mousetrap shuts once the needle comes back inside the flange, it's almost superfluous. Because if you look at the way the thing mechanically works, when the needle tip gets back inside, it springs the flange and slams shut. That's essentially right, Your Honor. I think that's right, because it's supposed to be simultaneous. Simultaneous with the withdrawal of the needle from the patient. I'm sorry, Your Honor. Simultaneous with the withdrawal of the needle from the patient. Correct. In your patent, the 544 patent, isn't it possible to do exactly the same thing that you're describing the patent suit as applying to? Which is to say, if you take the sequence of figures from figure 1 through figure 4, if the physician has just put the syringe into the patient's arm, let's say, and as the physician begins to withdraw the needle, the physician pushes on the device that comes up, device number 74, it looks like, pushes the guard down to the patient's skin and continues to press as the needle is being withdrawn, then at the moment that the needle emerges from the patient's skin, the trigger will snap and you will have essentially exactly the same phenomenon. Correct? How do they differ? And set aside for a moment the fact, which I recognize is a disputed issue in the case, that your snap is on the inside of the guard as opposed to the outside. Right. Setting that aside, how do the two differ if that's the way it's used by the physician? Which if the physician is trying to minimize the risk of needle stick, presumably that would be a very sensible way to do it. It does work differently because you are retracting from the patient everything, both the plastic body and the needle. In what device? In BD device. But what you're doing is you're pushing the guard towards the patient, so vis-a-vis the patient, the guard remains stationary. You see what I'm saying? No, your honor. If not, why not? Why doesn't it remain stationary? In other words, the physician, as the physician is pulling the needle out, the physician is pressing on the device that activates the forward motion of the guard. Therefore, as the needle comes out by two inches, you push in and the guard goes forward two inches, staying at all times in contact with the patient's skin. Why isn't that functionally the same as what the patent in suit describes? The patent in suit, as soon as you withdraw the needle, the guard into the guard, then the flange pops up. That's a manual step. But it can't do that until the needle is out of the body. And if the needle comes out of the body and is at the time it comes out of the body, it is within the guard and the flange comes shut, that would be true in your system as well, would it not? If the physician is making sure that the guard is up against the body. You have to, with the BD needle, you have to pull it out a distance away from the patient in order to then pop the switch which will flip up this cover. What happens with the BD device if the doctor's got the needle in my arm and the doctor activates the mousetrap, if you will, pushes the button while the needle is still in me, what happens? The guard will hit the patient in the arm. And then when the needle comes out, right, the needle retracts back into the guard. It's not designed to work that way, your honor. It's a different configuration. It's a different configuration. The NBO needle, it's automatic upon retracting the needle. I wanted to say earlier, a manual step is required both with respect to the patent device and the accused device, correct? In order to activate, as I call it the mousetrap, in order to activate the flange, so it locks down the contaminated needle, a physical act is required by the doctor in both instances, isn't that correct? But it's different physical acts. In NBO, you pull, you retract the needle and the guard pops up automatically. And the needle has to get out of the body, right? Right. Otherwise you have this bruising problem of the trap hitting my arm. As soon as it is out of the body, if you've retracted the needle, it pops up. Right. In BD, you have to first retract it from the body and then flip the switch manually. So obviously you have to get this needle out of the patient. That's the only way it's going to work, is when it's out of the patient. That's the only way any of this will work. Both ways, right? But what you're essentially saying is that the patent, the inventor, said my invention is limited to an invention whereby the patient applies the device against, the doctor applies the device to the patient, and then the doctor withdraws the needle, right, by pulling the needle back in. And at the time that the needle is coming out of the patient, the device is coming away from the patient and the thing snaps shut. Because the doctor is removing the needle, right, from me back into the device. But the doctor on the NBO needle has to take two steps. If we're talking about retracting the NBO needle, there's one step. You simply pull the needle back and it's secure. Right, but if we're in a doctor's room and I say the NBO needle is being used against me and the doctor goes in, the device is right up against my arm, correct? Right. And then when he withdraws the needle back into the casing, the trap goes shut right up against my arm, right? Correct, and that's what was disclosed in the specification and the prosecution history. BD, you've got to retract the needle, which is fixed. So you've got to pull the entire thing and then flip the switch. If you try to, on the NBO needle, keep the needle stationary and move the guard forward, move the guard of the body forward, you literally have to stick the guard into the patient to try and cover it. And that configuration certainly is not disclosed anywhere in the prosecution history or the specifications of any of the related products. Do we have a problem here with the end result of the district court seems to have said that the reissue patent flunks the recapture rule? Your Honor, that wasn't the opinion. How was the issue briefed? I mean, were both of you on that case down below? Yes, Your Honor. And so you're patent lawyers, you understand the rules on a reissue, right? And if you flunk the recapture rule, the claims are invalid, right? Correct, Your Honor. But this was not argued as it violates the rule on recapture. Therefore, the claim would be invalid. Why not? Well, because the recapture rule does go to the issue of whether or not the patent would be valid or the particular claims at issue would be invalid. What was said was that if— Let me cut to the chase. Let's assume that the court agreed with your side of the case on the so-called claim construction issue. And so we say, okay, it looks like you affirm. But we look at that one-line order the district court gave us saying no infringement. I don't know why he said no infringement. And the party certainly didn't help us on appeal with their briefs because nobody told me why there was no infringement. We talked a little about it today. Why don't we send it back and ask the trial judge to enlarge upon why there's no infringement, whether it's invalidity or whether it's just a matter of fact. Your Honor, once the claim construction order was issued, we filed a motion for summary judgment based on it. And that's not in the record here, I don't believe, is it? It is in the record, Your Honor. But not in the— The summary judgment itself, pleading, the opinions on summary judgment are not. MBO took the position that given the claim construction, it would not oppose our motion for summary judgment. And the judge granted that order. But the judge never made any kind of finding that the patent was invalid or the sole basis— You're saying that there was no infringement because you can't infringe an invalid claim? I don't believe that we argued that, Your Honor. We did argue other things like the fact that our needle was fixed and they repeatedly distinguished over DuPont, Smith, and Bayless because those prior needles all had fixed needles, just like the BD needles. I think I've run over my time, Your Honor. Yes, you have. We've been the offending parties, I think, not you. No problem, Your Honor. Thank you. Thank you. And I think we will restore— There's still something of a disparity in time, but we have to call a halt to this at some point. So why don't we give you, in light of the fact that you're somewhat below the total amount of time that you would otherwise be entitled to, let's give you five minutes if you need it. There's a lot of ground to cover here, I suppose. That's more than generous. I appreciate it. Let me start with the last issue, and that was what happened below. First of all, what happened below on claim construction was, Dr. Dickinson's position was quite simple. We tried to capture something by putting that relatively new term in those reissued claims. And they told the judge he could rewrite the claims to limit them to retraction. We told the judge, you can't do that. If you believe that's what's happened, the reissued claims are invalid. But he didn't listen to us. That's why, when we're dealing with claim construction, the Markman ruling, you'll see that he's ruled what that term, relatively new, means as being retraction. He can't rewrite the claim that way. He could only invalidate it. On summary judgment, what they did was they moved for summary judgment of non-infringement. And we can't contest that based on that ruling of rewriting that claim so that relative movement is only limited to retraction. And therefore, by the way they describe how their device should be used in their literature, that you don't retract. How that works, and that's a little confused here, how their device works, is explained in their patent. And what it amounts to is that the physician removes the needle from the patient and pushes the guard, the arm that's attached to the guard, forward, halfway down the needle candela. And when it gets halfway, there's a spring that takes over and whacks the guard out the rest of the way. It can be used exactly, Judge, as you said. You can stick it in the patient and activate it and then pull the needle out into it. That's not what their literature says, but it can be done that way. So that the guard, as the needle is being retracted from the patient, the guard continues to be fixed vis-a-vis the patient as the needle retracts into the guard? Exactly so. Would you call that retraction? Yes. You would, but then retraction is anything that produces the result that the needle is within the guard. That's... But that wasn't what I understood you to be defining retraction as. That's correct. But what it really points out is this, is that the relative motion here to get the needle into the guard depends on whether you're moving the guard, whether you're moving the needle, whether you're moving both of them, how the person uses it. Whether or not we're talking about a live donor. If you're using it in tubing, there's nothing to hold the antennae and joints against here. All that means is that doesn't make any difference as far as this invention goes. That wasn't the invention. That's not what they invented. The relative movement business, there's art that pushes it forward. There's art that pulls it back. That is not... You can use it both ways. A physician can use it both ways. That isn't the invention. What the invention always was, was as soon as that needle tip is in that guard, it can't come out again. And that distinguished every piece of art that they ever cited against us in this prosecution. Starting with Kothi, the first one. We said in that, when we talked about retraction, what we said in that patent, describing that patent was that for Kothi, what it does is it doesn't function like ours. If you relax the bows, it retracts the needle. We admitted it did that. But if you push the bows again, the needle tip can come out. It can reemerge. That's how we distinguished Kothi. Same thing with DuPont. When we filed the first CIP application, there's another claim in there that isn't limited to retraction. What we were talking about in all these amendments was preventing reemergence. And one last thing I want to say on the Bayless reference was this. When we distinguished Bayless for five things here, that rejection was overcome. We amended plenty of things a little bit. It doesn't affect what we're talking about here. They came up with another rejection, Bayless-Cohen. Cohen retracted. How did we argue that that combination differed from the Bayless-Smith one? Same way. We mentioned retraction. And we said Cohen didn't have that. Not by itself. But Cohen doesn't have a safety needle that prevents it from reemergence. And the retraction was just mentioned here as how it happened to work in that particular claim. It was not distinguished on that basis. Thank you. Thank you, Mr. Stanion. Thanks to both counsel. The case is submitted.